UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 26-37 (JWB/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRENNA MARIE DOYLE,<br><br>Defendant. | DEFENDANT'S POSITION ON SENTENCING FACTORS |

Brenna Doyle is a 19-year-old young woman who cares deeply about the injustices she sees in the world. She is particularly triggered by perceived abuse of power by law enforcement, having grown up being abused by her abusive police officer father. This stew of unresolved emotional turmoil led Brenna, in a rash moment in the early morning hours after a sleepless night, to make three threatening telephone calls in quick succession to an FBI agent whose contact information she had found on social media. She had no intention of carrying out her threats and in her youth, she failed to recognize the distress her calls would have on the agent and his family.

In five minutes, Brenna's offense conduct had ended, but it was too late. She now stands convicted of two misdemeanors and faces sentencing before this Court. Given the many mitigating circumstances which help to explain, but not justify, the offense conduct, the defense asks the Court to impose a sentence that will actually promote Brenna's rehabilitation, rather than one that will make her life more difficult. Specifically, we ask the Court to impose a term of probation with a

condition that she take part in mental health treatment and counseling without a term of house arrest that will only make Brenna's life more difficult.

FACTS

**1. Brenna's Abusive Childhood**

Brenna Doyle is 19 years old. She was born in San Jose, California, but raised primarily in Gilroy. PSR ¶ 46. Her parents, Theresa and Mark Doyle were married for 25 years before they divorced when Brenna was around 10. Brenna is the second youngest of her parents' six children. Brenna's sister Caitlyn, 11 years older, was like a surrogate mom to Brenna and her siblings. Cosby Report[1] at 3. Caitlyn described the family structure of the children as falling into three categories—"the golden child, the invisible child, or the scapegoat."

Unfortunately, Brenna was the scapegoat. As described in the PSR, "Doyle reported a history of severe childhood physical, emotional, and sexual abuse perpetrated primarily by her father, as well as ongoing emotional abuse by her mother." PSR ¶ 47. Her father, according to Brenna, was an "abusive, drunk dad." Cosby Report at 2. She describes "her father 'punching, throwing, elbowing, [and] backhanding' her. She stated that some form of physical abuse occurred daily, at least toward her, her mother, or her eldest sister. '[He] would walk past me, and every single time, I'd flinch,' she said, 'It didn't matter the day, but some days were worse than others, and he became upset over the smallest things.'" Cosby Report at

[1] The defense has filed under seal as Exhibit 1, the report of Dr. Robert L. Cosby, Psy.D., a psychologist in Spokane, Washington who conducted a psychiatric evaluation of Brenna at the request of the defense. That report is referenced here as "Cosby Report."

3.

Brenna's mother was also an alcoholic, and she did not protect Brenna, although she also was a victim of her husband's physical abuse. Cosby Report at 5. Instead, Brenna's mom simply pretended that she did not notice Brenna being abused. *Id*. at 3.

Brenna has few memories of her childhood due to what she describes as a "trauma block," by which she unconsciously blocked out traumatic memories as a survival mechanism. Nonetheless, certain episodes of abuse remain etched in her memory.

She recalls hiding behind a closed bedroom door only to have her father break the door down. She remembers being punched in the stomach multiple times. As a punishment for running in the house, her father elbowed her so hard she "flew into a wall."

Another incident which both Brenna and Caitlyn clearly recalled related to some missing chocolate. Although the family often lacked for food, the parents kept a kitchen cupboard that was reserved for their special snacks, including the chocolate, which was off limits to the children. Brenna's mother accused her of eating the chocolate, which Brenna continues to deny to this day. Her father, as the disciplinarian in the family, ended up punching Brenna in the face, knocking out two baby teeth. Brenna still remembers seeing the trail of blood. She was then sent to her room without food for several days. Cosby Report at 3. Much later, when she talked about the incident with her siblings, a younger brother admitted that he was

the one who ate the chocolate. He was too afraid to confess at the time, allowing Brenna to take the blame and suffer the consequences.

Restrictions on food were a norm in the household. Her father put locks on the refrigerator and kitchen cabinets to control his children's access to food. Cosby Report at 3.

As a tween, Brenna took part in a children's baseball league. Unfortunately, her father was involved. When Brenna made a mistake, he became so enraged, he smacked her across the face.

Although Brenna received the brunt of her father's abuse, her siblings and mother were not spared. She recalls seeing her dad slap her sister in the head and throwing her mom around, pushing her against a wall, and throwing dishes at her. She regularly witnessed her father punching her mother. Cosby Report at 3.

Her father was also sexually inappropriate, often grabbing Brenna's buttocks when he hugged her. This made her very uncomfortable. Cosby Report at 3.

Brenna was homeschooled by her mother until the 7th grade, which insulated the family from the attention of child protective services given her obvious injuries. Once she started school, she wrote something on her desk about how scared she was at home. When her teacher found what she had written, she contacted CPS. The agency conducted an investigation of the family, but ultimately, Brenna was not removed from the home, and no protective measures were implemented. PSR ¶ 49.

In addition to the CPS report initiated by Brenna's teacher, Brenna's older sister Caitlyn also personally contacted CPS to report the abuse going on

after she had left the home as an adult. As she stated to a defense investigator, "I genuinely don't understand why nothing came of it. It's a scar for me." Caitlyn elaborated, "I called the cops and talked to CPS. It was reported to teachers and the school, too. They didn't find anything. Always, after they talked to dad, nothing would ever come of it."

Brenna's father is a police officer, and she attributes the lack of CPS response to his influence. Cosby Report at 3. In Brenna's words, her father may have been a cop, "but he wasn't a cop at home." As the PSR notes, her father's position as a police officer "contributed to her perception during childhood that he had significant authority and influence, which caused her to fear reporting the abuse or believing that others would intervene or hold him accountable." PSR ¶ 48.

In addition, Brenna recognizes that given the abuse she suffered at the hands of her police officer father who seemingly was above the law, she finds that "media reports or perceived incidents involving abuse of authority by law enforcement can be emotionally triggering due to her personal experiences with her father, as she notes was seen in the instant offense." PSR ¶ 48.

Although Brenna's parents finally separated when she was 12, things did not markedly improve. Following the divorce, her mother and the younger children moved to Spokane, Washington for a fresh start. PSR ¶ 46. Her mother obtained a restraining order against Brenna's father. Brenna has not had contact with her father for over six years. She has no interest in ever having contact with him, but she hopes he gets the help he needs.

With the divorce, her father's physical abuse ended, but her mother's verbal and emotional abuse only increased. PSR ¶ 47. Her mother repeatedly told her she was "not good enough" and that she didn't love her. As the ultimate insult, her mother would yell, "You're just like your dad," and threatened to kick her out of the house and send her to a shelter. At times, her mom made good on her threat, kicking Brenna out of the house when she was only 13. Brenna spent extended time at a shelter for homeless youth. Cosby Report at 4.

In addition, Brenna was now attending public school for the first time. She found that she was academically behind her classmates, and she did not fit in. She was cruelly bullied by her classmates, and school was not a safe space for her. Cosby Report at 4.

No longer shackled by the fear of her father's reaction, Brenna rebelled. She began to use drugs to numb her pain. PSR ¶ 61; Cosby Report at 6. When she was 14, she nearly died when she was given an unknown pill which turned out to contain fentanyl. Cosby Report at 11. She spent two days in the hospital, but her mom never showed up. *Id.*

Starting at age 12 and continuing to 15, Brenna began to run away from home. As she explains, she could not have run away when her father was in the house: "I couldn't with Dad there. He would find and literally kill me. Think about what he did when he thought I ate chocolate. He beat my ass. If I did that? I would die."

Brenna's relationship with her mother continued to crumble. Her mother

refused to provide her with basic necessities, telling her, “If you want something, get it yourself.” As a result, if Brenna wanted an extra snack or clothes, she had to sell something to afford it. At times, Brenna would bake cookies to sell in order to buy birthday presents for friends, after paying her mother for the ingredients.

But her financial desperation is also reflected by the fact that she at times engaged in prostitution as a juvenile. When she was 12, after running away from home, she had sex with a 30-year-old man in order to pay for a hotel room. *See* Cosby Report at 4. This was her first time having intercourse. While at the hotel with the man, she got scared and called her sister who came to rescue her. They called the police, and the man was arrested. *Id.* Brenna still blames herself for this episode. *Id.* at 9. As she explains, “she was so desperate to get away from her father’s violence and unsupportive home environment that, in her 12-year-old mind, she reasoned it would be better to lose her virginity and have sex with a grown man than return home.” *Id.*

In a separate episode, when Brenna was 13 or 14, she was visiting a friend when the friend’s 17-year-old brother held her down and raped her. *Id.* at 4, 14.

Brenna tried to legally emancipate herself as a juvenile, but her mother refused to allow it. Ultimately, Brenna managed to convince her mother to agree to a compromise that allowed her to move into an apartment with a friend at the age of 16. PSR ¶ 52. Brenna has been on her own ever since. Her mother would not teach her how to drive, so Brenna found other adults to help her. Eventually, she was able to save up enough money to buy a used car.

Brenna's life began to improve after she moved out of her mother's home. Cosby Report at 4. *Id.* She also left the traditional high school, where she was bullied, and enrolled in an alternative school called YouthBuild, a program for low-income youth. Feeling safe and in a positive environment, she quickly earned her GED. Cosby Report at 6; PSR ¶¶ 66-67. She then went on to Spokane Community College, where she hoped to earn an associate's degree, but she ran out of money. PSR ¶ 67. This was upsetting for Brenna, because "I love learning. I really liked it." Brenna was able to earn good grades in this more conducive environment.

As soon as Brenna turned 16, she started working and supporting herself. She was hired for the staff at YouthBuild, her high school. Other jobs included Zips and Carl Jr.'s, both fast-food restaurants. She typically had more than one job at a time. PSR ¶ 69.

At the time of the instant offense, Brenna was working as a shift lead at Jersey Mike's sandwich shop. Because the FBI chose to arrest Brenna at her job, she was fired. In addition, she was evicted from her apartment with only three days notice to vacate as a result of media coverage of her arrest. In her words, "It was a cherry on top of a shit sundae."

Brenna was successful in finding new employment at Ace Hardware, where she was quickly promoted to assistant manager. They are aware of her legal situation and have been supportive. And after a short time living with her mother, she is again living indepndently in her own apartment.

Brenna recognized that she needed some distance from her mother and

abusive past in order to heal. She has begun to date, has made stable, healthy friendships, and even has begun to reconcile with her mother. Cosby Report at 5. She loves her mother, she said, but understands that "her mother needs to work on her issues and trauma before she can effectively assist others." Cosby Report at 6.

Brenna's dream has always been to be a pediatrician. Having been abused herself as a child, she feels a calling to protect other children and to give back. She wants to help people. Although she is grateful for her job at Ace Hardware, her hope is that she can return to college. Cosby Report at 6-7.

### 2. Brenna's Mental Health Challenges

Not surprisingly, given her traumatic childhood, Brenna has a long history of mental health challenges. She has been in mental health treatment for most of her life. As an adolescent, she was diagnosed with attention-deficit/hyperactivity disorder (ADHD), depression, anxiety, post-traumatic stress disorder (PTSD), borderline personality disorder, and adjustment disorder. PSR ¶ 55; Cosby Report at 7-8. She has a history of suicidal ideation, self-harm through cutting,[2] and two suicide attempts. *Id.* at 8. Both attempts were likely cries for help. On one occasion, she attempted to jump out of a window at age 7, but was stopped by her sister. On another occasion at age 15, she took an overdose of Benadryl. Sadly, if these were cries for help, they went unheeded. On two occasions, Brenna was hospitalized because of suicidal ideation. PSR ¶ 55.

[2] Brenna described the episodes of self-harm, which occurred between the ages of 12 and 15 "after sexual victimization and amid ongoing family instability" as "a way to distract from emotional pain." Cosby Report at 25.

Brenna is prescribed Guanfacine and Amphetamine Salts. PSR ¶ 56. Guanfacine is used to treat post-traumatic stress disorder. It reduces hyper-arousal, impulsivity, and emotional reactivity. Cosby Report at 8. Significantly, she was off her medications at the time of this offense. *Id.*

Brenna is currently in treatment through Frontier Behavioral Health in Spokane, Washington as a condition of her pretrial release. Her participation in treatment has been consistent since her pretrial release, and she is currently psychologically and emotionally stable. *Id.*

In a recent evaluation by Dr. Robert Cosby completed for the defense and filed herewith under seal as Exhibit 1, Dr. Cosby diagnosed Brenna as suffering from post-traumatic stress disorder and ADHD. Cosby Report at 20. The PTSD, Dr. Cosby opined, causes Brenna to experience "panic, irritability, fight-or-flight responses, sleep disruption, hypervigilance, and episodes of becoming emotionally overwhelmed when triggered." Cosby Report at 23. As a result, "[w]hen she perceives danger, injustice, humiliation, or helplessness, her responses may become disproportionately intense, not because she lacks empathy or is characterologically manipulative, but because her nervous system appears primed to detect and respond to threat." *Id.*

Dr. Cosby explicitly rejected the diagnosis of borderline personality disorder, which Brenna essentially diagnosed herself based on a brochure. *Id.* at 19, 24-25. He noted that some of Brenna's emotional and behavioral difficulties are "are best understood as the sequelae of chronic interpersonal trauma rather than as evidence

of a fixed personality disorder, antisocial orientation, or ingrained violent attitudes." *Id.* at 26. In Brenna's case, those difficulties arise from "repeated exposure to violence, exploitation, and inadequate protection. They reflect learned survival responses, not a fixed personality disorder." *Id.* at 25.

Dr. Cosby noted that Brenna's "life history is marked by extraordinary adversity. She described growing up in a household characterized by severe physical violence, intimidation, emotional neglect, exposure to domestic violence, and sexual boundary violations." *Id.* at 25-26. "At the same time, Ms. Doyle's history should not be reduced to her trauma." Dr. Cosby cautions.

> Despite the magnitude of her adversity, she has demonstrated a notable degree of resilience, insight, and self-directed growth. She moved out of an unstable home environment at age 16, earned her GED through the Youth Build Program, attended Spokane Community College, maintained employment across multiple jobs while attending school and providing for herself, and has continued working since her arrest. These accomplishments reflect initiative, persistence, future orientation, and a desire to build a life defined by work, education, self-improvement, and service to others rather than by the trauma she endured.

*Id.* at 25-26.

With respect to the offense conduct, Dr. Cosby noted that at the time of the offense, Brenna had not taken her guanfacine for several months. *Id.* at 26. When she is off her medication, "she is more vulnerable to emotional highs and lows, impulsivity, irritability, and reduced behavioral inhibition." *Id.* at 27. In that context, her "conduct appears best understood as a brief, impulsive, emotionally dysregulated response rather than as the product of planned violence, ideological extremism, or sustained intent to harm." *Id*. Dr. Cosby opined that Brenna is not a

danger to the FBI agent in this case, law enforcement generally, or the public at large:

> Ms. Doyle appears to present a low risk for violent recidivism, particularly if she remains engaged in treatment and continues developing adaptive coping strategies. Her alleged conduct appears to have been situational, emotionally driven, impulsive, and connected to untreated or undertreated trauma-related dysregulation. It does not appear to reflect a stable violent orientation. Nor does it appear to reflect a broader commitment to harming government agents, agencies, or retaliating against law enforcement personnel. Rather, the alleged events appear to have functioned as a painful, sobering lesson for Ms. Doyle. She has not responded with defiance, indifference, or externalization. Instead, she has expressed shame, remorse, and an earnest desire to change.

*Id.*

Since her arrest, Brenna has resumed therapy through Frontier Behavioral Health. *Id.* at 8, 15, 28. She is taking her medications as prescribed. *Id.* In therapy she

> identified emotional regulation and anger management as treatment goals, and developed a healthier coping strategy through distance running. . . . [H]er progress reflects the emergence of a prosocial, structured, and healthy coping strategy that helps her regulate distress without substances, self-harm, or impulsive behavior.

*Id.* at 28.

**3. Offense Conduct**

On January 7, 2026, during an immigration enforcement action known as Operation Metro Surge, DHS agent Jonathan Ross, shot Renee Good in the head at point blank range, killing her in broad daylight, while Ms. Good's wife and members of the community helplessly looked on. After shooting and killing Ms. Good, Jonathan Ross expressed no concern for his victim. His final words to the mother he

had just shot in the face: "Fucking bitch." *See* Melissa Gira Grant, *Trump and ICE Want You to Believe Think Renee Nicole Good Deserved It*, New Republic (Jan.13, 2026) (available at https://newrepublic.com/article/205199/renee-good-shooting-misogyny).

A week later, on January 14, 2026, ICE agents shot a man in the leg while trying to make an arrest.[3] With emotions running high following the murder of Ms. Good, a crowd quickly gathered at the scene of the January 14 shooting to protest ICE lawlessness and unrestrained violence. Plea Agreement ¶ 2a. When the crowd became unruly, FBI agents who were on the scene to investigate the shooting, retreated, leaving two of their vehicles at the scene. Some of the protesters broke into the vehicles and stole documents containing personal identification information for a number of FBI agents. The PII soon found its way onto social media, and a number of agents whose information had been compromised began to receive threatening and harassing phone calls and emails.

Brenna Doyle has never been to Minnesota. She was not part of the January 14 protest and had nothing to do with the vandalizing of government vehicles or the posting of PII on social media. Throughout the relevant events, she was in Spokane, Washington where she lived.

And like many concerned citizens across the country, she was following the events unfolding in Minnesota and becoming more and more distressed. But, unlike

[3] The ICE agents involved in the shooting lied about the circumstances leading to the shooting. One of them is now charged criminally in Hennepin County with four counts of second-degree assault and one count of falsely reporting a crime. *See* *https://www.hennepinattorney.org/news/news/2026/may/castro-charges*.

most others following the news, she felt a personal connection to what she perceived as the abuse of power by law enforcement because of her own abuse at the hands of her police officer father. As Dr. Cosby notes, Brenna "viewed her father as a domineering aggressive officer; she viewed the ICE events as reflecting domineering, aggressive officers." Cosby Report at 27. This was "triggering" for Brenna. She explained that "the events reminded her of her father—a former police officer—his abuse, and her related childhood trauma." *Id.* at 12. She cares deeply about other people, especially people who she sees being hurt and abused by those in power.

Brenna had been off her meds for months. She was feeling increasingly agitated, irritable, and emotional about what was going on, in particular ICE actions she considered to be "morally wrong and unjust." *Id.* at 12. She felt powerless to do anything to help. So, when she saw the numbers of the law enforcement agents leaked on line, she impulsively picked up the phone and called.

Brenna made three calls in quick succession. Victim A received the calls between 7:31 and 736 a.m. central time, 5:31 a.m. in Spokane, Washington. Brenna had gotten little sleep that night, instead doom scrolling on social media, becoming increasingly upset. She thought, here is another cop who does whatever he wants. When she made the calls, she thought the agent was an ICE officer.

But her comments had more to do with her experience with her father than with Metro Surge. Although she did not know the officer or anything about him, at 7:31 she told him, "You ruined my life." At 7:33 she called him a "fucking stupid

wife beater." And at 7:35, she said, "You rip my family apart, I'll rip your family apart." Plea Agreement ¶ 2c.

As Dr. Cosby explains, "Ms. Doyle's conduct appears best understood as a brief, impulsive, emotionally dysregulated response rather than as the product of planned violence, ideological extremism, or sustained intent to harm." Although Brenna understood she was not talking to her father, still "she had internalized the situation in a way that was not directly related to the ICE events themselves. She explained that she felt 'sorry for myself and my past' and channeled unresolved distress inappropriately." Cosby Report at 27. Dr. Cosby continued:

> [Brenna] further denied thinking that she was yelling or communicating with her father; nevertheless, the pattern appeared relatively clear—she viewed her father as a domineering aggressive officer; she viewed the ICE events as reflecting domineering, aggressive officers. Thus, per her, she felt triggered. This explanation is consistent with her trauma history, testing data, and observed pattern of becoming emotionally overwhelmed when feeling triggered, helpless, morally outraged, or threatened.

*Id.*

Brenna's impulsive calls, then, were more about her unresolved trauma from the abuse she suffered at the hands of her father than about hatred of law enforcement.

> Importantly, Ms. Doyle denied hatred toward the alleged victim, denied a desire to harm him or his family, denied extremist or violent ideological beliefs, denied affiliations with violent groups, and denied taking any steps to carry out violence against the agent, his family, or any other government official.

*Id.* Brenna had no intention to act on her threats and took no steps to do so. *Id.* at 12.

Brenna is extremely remorseful for her actions. She recognizes that she caused the victim agent and his family considerable distress, and she feels very bad about that. *Id.* at 9, 13, 26. She has never attempted to justify her actions, instead noting that she "let herself and others down." *Id.* at 13. She said, "I scared that little girl and a family, a father, who worried about his child just for doing his job." *Id.* She sees her actions as "inexcusable" and wants to apologize to the agent and his family. *Id.* at 13, 9. *See* PSR ¶ 14 (Brenna states: "*Saying sorry would never undo the emotional damage I did to not just the people I said those horrible evil things to but it hurt there loved ones, made there entire family worrie in distress. I was upset because I saw something going on in the world that was evil and scary and I turned around and acted in a disgusting way, said evil heartbreaking things I would never follow through on.*")

**D. Support from Family and Friends**

The people who know Brenna best, her family and friends, know that her unthinking rant while in the depths of her despair does not typify who she is as a person and does not negate her many positive attributes. They know she is so much more than the impulsive act that brings her here.

Caitlyn Anderson, Brenna's oldest sister, describes what it was like for the children growing up with two inebriated parents in a home where "the bourbon poured freely most evenings." Ex. 3 at 1.

> The house we grew up in was neglected. Animal messes were everywhere, dishes were left in the sink until mold or maggots appeared, bathroom toilets clogged for days at a time, plumbing issues left unaddressed caused water damage and black mold. Us children were expected to do laundry, clean bathrooms, care for animals, cook meals, and keep up with other housework as chores to "teach us

> independence". If we did not complete these tasks to our parents' expectations, there were consequences but seldom guidance to enable success.

*Id.* at 1-2.

And through it all, Brenna was the scapegoat. Although both Caitlyn and Brenna suffered childhood abuse, Brenna "endured it longer than I did and in its more extreme forms." *Id.* at 1. Given the abuse she suffered, Brenna grew up to become someone who "advocates for the vulnerable" because "she never wants anyone to feel how she felt growing up or experience the things she went through." *Id.* at 2. These were precisely the impulses that caused her to act when she made the phone calls that bring her before this Court, although, as she now understands, she responded inappropriately.

Megan Doyle, another sister, echoes many of these themes. She sees Brenna as someone with "a big heart and a strong voice. She is probably the most empathetic person I know, she cares so deeply for others and is always so in tune with what's going on in the world." Ex. 3 at 3. According to Megan, "Brenna is one of the most compassionate, resilient, strongest, most willing to do anything to help a person I know." Megan concludes by saying "I am so proud to call her my sister." *Id.*

Sara Doyle, a third sister, describes how Brenna would prepare food bags and distribute them to homeless people in the community. At the time, Brenna was working two jobs and relying on public transportation to get around, "yet she still found ways to give back to those who were less fortunate." *Id.* at 4.

Brenna's friends also see her as a compassionate person who is always willing to help someone in need. Rebecca Chicklinsky describes how Brenna sat in the hospital with Rebecca's sister when Rebecca was unable to do so. When Rebecca's dog was dying, Brenna took the pet to the vet. She had time to help her friend even though she was working two jobs at the time. *Id.* at 5.

People who supervised Brenna at work and school are also supportive. Sunny Wilson supervised Brenna for over a year when she completed her GED at YouthBuild. Ms. Wilson describes Brenna as "dependable, respectful, and willing to work hard." Ms. Wilson continues, "she is a good person who is committed to moving forward in a positive direction. Over the years, I have seen her make consistent efforts to improve her life through education, work, and personal growth." *Id.* at 6.

Finally, Stace Heston is the owner of the Ace Hardware where Brenna is currently employed. Mr. Heston describes how Brenna, originally hired as a cashier, quickly advanced to sales associate and then assistant manager. He states that Brenna "has the traits of a leader. She is conscientious, humble, leads with a servant heart, and is willing to quickly learn all while performing her duties." *Id.* at 6.

## DISCUSSION

Brenna Doyle is a 19-year-old woman who has suffered a long history of sexual assault, physical violence, childhood abuse, emotional and verbal abuse, neglect, and exploitation. In a stew of emotional turmoil and distressed by what she perceived as the blatant abuse of power by law enforcement, in the early morning

hours after a sleepless night, she made three impulsive calls to law enforcement which were more pertinent to her relationship with her father than with anything having to do with the victim of the crime. In five unthinking minutes, she had committed a federal crime.

Brenna has taken this episode to heart. She recognizes the effects of her actions on others and has committed to never repeating them. She is taking her mental health more seriously and is taking part in regular therapy. Cosby Report at 28. She has identified emotional regulation and anger management as treatment goals. She has turned to long-distance running as an important coping mechanism. According to Dr. Cosby, Brenna's "progress reflects the emergence of a prosocial, structured, and healthy coping strategy that helps her regulate distress without substances, self-harm, or impulsive behavior." *Id.* Brenna "has committed herself to a lifelong process of change to help ensure that nothing like the alleged events occurs again." *Id.* at 13.

Brenna has proven herself to be a survivor. She has supported herself since the age of 16—working at various jobs, supporting herself, living independently, putting herself through high school, attending college, being promoted at work—all without parental support or engagement.

Although rehabilitation is out of vogue in the criminal justice system, this Court should fashion a sentence that provides support to Brenna in achieving her goals. This case could be a turning point in Brenna's life—the call for help that

finally was answered and provided her with the resources she needs to be the best version of herself. Or, it could simply set Brenna up for failure.

The applicable guideline range is 6-12 months, but the government agrees that even a short prison sentence is not appropriate for Brenna. It has agreed to recommend a year of probation "with up to 12 months' home confinement." Plea Agreement ¶ 10. While the defense agrees that a probationary sentence is appropriate, a year of home confinement will only serve to make Brenna's very complicated life even more difficult and ultimately, despite her best efforts, may set her up for failure.

Instead, we ask the Court to impose a sentence of one-year probation with the following conditions:

1. That she continue to maintain employment or schooling;
2. That she continue in mental health treatment and comply with the recommendations of her treatment provider, including that she take prescribed medication;
3. That she refrain from the use of controlled substances and submit to random urinalysis;
4. That she attend drug treatment if recommended.

A probationary sentence is warranted by the following factors, each of which support a downward variance from the applicable guideline range.

**1. Rather than assisting Brenna, house arrest will be counterproductive.**

Perhaps most important, a sentence to house arrest will make Brenna's exceedingly complicated life more difficult. In addition to her job, she has two dogs at home that need walks. She has found that running provides a way of calming her down when she becomes emotionally distraught. She hopes to return to school and perhaps, start a small business. She is juggling a large number of balls and does an admirable job of keeping them all in the air.

Even so, a condition that in addition to all of her obligations, she be subject to house arrest will impose another unnecessary burden and complication. If she is only allowed to leave the house on a specified schedule, she will be unable to monitor her own emotional state and participate in the coping activities she needs. Feeling stressed, should she go for a run—risking the possibility of a violation of her house arrest—or should she simply suffer through her distress and perhaps act out? What if her probation officer is not available to give her permission to leave the house at an unexpected and unpredictable time? When is she permitted to walk her dogs? What if they do not abide by her schedule? What if her work schedule changes unexpectedly?

As Dr. Cosby noted with respect to house arrest:

> [T]o the extent the Court imposes structured conditions such as home detention or electronic monitoring, Ms. Doyle's treatment progress would likely be best supported by conditions that are tailored to her specific coping needs. From a psychological and treatment perspective, I strongly encourage Ms. Doyle to continue running. She also has two dogs and finds it meaningful to take them for daily walks around her neighborhood. Accordingly, overly restrictive conditions that prevent

> her from using these coping strategies, particularly while distressed, might be counterproductive and unintentionally remove the healthier tools she has developed. In the examiner's view, if community safety and supervision goals can still be met, allowing structured opportunities for running, outdoor exercise, fresh air, and walking her dogs would likely support, rather than undermine, Ms. Doyle's rehabilitation and risk reduction.

Cosby Report at 30.

This Court should not impose any conditions of probation that, rather than supporting Brenna's efforts at rehabilitation, would only make her life more complicated.

**2. The offense conduct was a product of youthful impulsivity and mental health struggles**

Brenna committed this offense when she was 18 years old. She was feeling emotionally overwhelmed as she watched helplessly what was going on in Minnesota during Metro Surge. She recognizes that her conduct was inappropriate and irrational. It was impulsive, rash, and unthinking, exactly the type of behavior that is not atypical for a teenager.

Although as an 18-year-old when she committed this crime, Brenna is treated under the law as an adult, as a matter of brain development she is still a child. Even today, at 19, the prefrontal cortex of her brain is not fully developed. The prefrontal cortex is responsible for impulse control and reasoning, yet it is not fully functional until the late 20s. Until it is fully developed, young adults like Brenna are biologically unable to engage in sound decision-making and to weigh the long-term consequences of their actions. As a result, immaturity often results in "impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S.

551, 569 (2005) (citation omitted).

For those reasons, the courts recognize that a defendant's youth is a valid sentencing consideration. *See, e.g., Gall v. United States*, 552 U.S. 38, 58 (2007) ("Immaturity at the time of the offense conduct is not an inconsequential consideration."). As the Supreme Court has observed, "The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.'" *Roper*, 543 U.S. at 570. *See United States v. Dean*, 626 F. App'x 586, 588 (6th Cir. 2015) (affirming 24-month downward variance because defendant was only 21 when he committed child pornography offense).

Brenna's youth, history of abuse, and mental health struggles are appropriate considerations in determining an appropriate sentence.

**3. A probationary sentence is not "getting off easy."**

Given the unusual circumstances of this case, the sentencing factors in 18 U.S.C. § 3553(a) support a non-custodial sentence. As the Supreme Court has observed, probation is not getting off easy. "[P]robationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *Gall v. United States*, 128 S. Ct. 586, 595 (2007) (citation omitted).

Defendants deserving of a probationary sentence, have not escaped justice or been given a "break."

> Probation is not granted out of a spirit of leniency. . . . [P]robation is not merely 'letting an offender off easily.' The probation or parole conditions imposed on an individual can have a significant impact on both that person and society. Often these conditions comprehensively

> regulate significant facets of their day-to-day lives. They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a case worker or psychotherapist.

*Gall*, 552 US. at 595 n. 4 (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) and 1 N. Cohen, The Law of Probation and Parole, § 7:9 (2d ed. 1999)).

Brenna has proven herself to be a good candidate for probation. She has been on pretrial release since January 28, 2026, a period of nearly seven months. As a result of this offense, she lost her job and her apartment. Yet, once again she was resilient in the face of adversity. She found new employment at Ace Hardware, where she has already been promoted to assistant manager, and a new apartment. She has complied with all of her conditions of release. As a result, on May 19, this Court relaxed her conditions by removing the conditions of a curfew and location monitoring. Returning her now to house arrest is a step in the wrong direction.

**4. A probationary sentence is commensurate with the sentences of the vandals who stole the agents' personal information.**

This offense would not have been possible had vandals not broken into government vehicles and stolen documents identifying law enforcement agents. Several of those individuals have been prosecuted and sentenced. Because their conduct catalyzed Brenna's offense, the sentences they received are relevant to the Court's consideration of an appropriate sentence.

James Lauer pleaded guilty to using his truck and tow straps to rip a lockbox from the rear of a law enforcement vehicle. *See United States v. James Christopher Lauer*, Crim. No. 26-23 (DSD/SGE), Doc. No. 88 at ¶ 2b (Plea Agreement).

Magistrate Judge Elkins sentenced him to one year probation with no house arrest. Doc. No. 89.

Korey Carroll, a co-defendant in the same case, broke the window of a government vehicle and stole items in the car. No. 26-23, Doc. No. 95. Magistrate Judge Elkin also sentenced him to one year probation. Doc. No. 100.

Michael Wallace Johnson III worked to try to smash open the lock box that Mr. Lauer stole. He also received one year probation. Doc. No. 97, 98.

And Lanisha Taylor pleaded guilty to stealing a 50-round box of 9 mm hollow-point ammunition that was labeled "Law Enforcement Only" from the lock box. Doc. No. 110. She was sentenced to 60 days probation. Doc. No. 111.

While the defense recognizes that Brenna caused a family to fear for their safety, her offense would not have been possible had it not been for the vandalism and destruction of property that the individuals noted above committed. In addition, Brenna's youth, history of abuse, mental health challenges, and impulsivity are unique to her and warrant a sentence no greater than these four received. In contrast to those cases, Brenna's offense conduct lasted no more than five minutes.

## CONCLUSION

Brenna Doyle's life is a remarkable story of resilience, tenacity, hard work, and survival. She has overcome tremendous odds as a result of the abuse she suffered as a child and has persevered. Yet, like most teenagers, she still makes mistakes. This offense is one of them.

This Court should not impose a sentence that will only make Brenna's life harder, and perhaps, set her up for failure. This Court should impose a sentence of one year of probation, with conditions addressing her mental health and substance abuse challenges. An additional condition of house arrest is unwarranted and counterproductive, and this Court should reject it.

Dated: August 26, 2026

Respectfully submitted,

*s/ Robert D. Richman*
ROBERT D. RICHMAN
Attorney ID No. 226142
P.O. Box 16643
St. Louis Park, MN 55416
(651) 278-4987

Attorney for Brenna Doyle